IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PRINCE D. KEY,

                Plaintiff,

     v.

SANDRA MCARDLE, JOLINDA WATERMAN,
BETH EDGE, MICHAEL SNODGRASS,
SCOTT A. HOFTIEZER, and JAMES GREER,

                Defendants.

ORDER

18-cv-510-jdp

---

Plaintiff Prince D. Key, appearing pro se, alleges that defendant prison officials violated his rights by failing to properly treat his injured knee and colitis and that they failed to respond to a medical emergency when he woke up with a swollen chest, which turned out to be a bacterial infection. Key brings claims under the Eighth Amendment to the United States Constitution.

Defendants fall into two groups: (1) current or former Department of Corrections employees Jolinda Waterman, Beth Edge, Michael Snodgrass, James Greer, and Scott Hoftiezer (whom I will sometimes refer to as the "state defendants"); and (2) Nurse Practitioner Sandra McArdle, who worked for a company contracted to provide medical services at the prison. Both sets of defendants have filed motions for summary judgment. I will grant both motions for summary judgment because Key fails to show that any of the defendants acted with conscious disregard toward his medical problems. The case will be dismissed.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

Plaintiff Prince D. Key is a prisoner at Wisconsin Secure Program Facility (WSPF). Several of the defendants worked at WSPF: Sandra McArdle was a nurse practitioner, Jolinda Waterman was the health services manager, Beth Edge was a nurse, and Michael Snodgrass was a sergeant. Defendant James Greer was the director of the Bureau of Health Services. Defendant Scott Hoftiezer was a physician at Dodge Correctional Institution who also served as the bureau's associate medical director.

## A. Knee injury and colitis

Key was transferred to WSPF on August 19, 2016. Key had history of right knee pain from loss of cartilage. Shortly after arriving at WSPF, a non-defendant provider prescribed Key gabapentin for pain and ice for swelling, and referred him to physical therapy. Key's gabapentin was canceled in early September because he did not meet the criteria for that drug. Defendants do not explain the reasoning behind this particular decision, but they explain with regard to his later care that gabapentin is not recommended for the type of pain Key was suffering. Upon re-examination, a provider gave him a "no kneel" restriction and prescribed tramadol, a pain medication similar to opioids.

Key's physical therapy ended in late October 2016 after the therapist noted that Key was receiving pain medication and that Key had met his therapy goals. After completing physical therapy, Key requested a renewal of his tramadol. The non-defendant nurse practitioner who saw Key noted that he had improved strength and range of motion after physical therapy. She continued the tramadol for two weeks but considered tapering him off

the medication before his tramadol use became chronic. In early November, the nurse ordered an MRI and an offsite consultation, and she continued Key's tramadol.

Beginning in November of 2016, Key began reporting abdominal pain and blood in his stool. In early December, the "Class III Committee" approved a request for a colonoscopy. The Wisconsin Department of Corrections uses this committee—made up of doctors and nurse practitioners—to decide whether health-care requests are medically necessary.

In early December 2016, Key was seen in the Health Services Unit and offsite for his complaints of rectal bleeding. Over the next couple weeks, Key submitted health service requests asking for renewal of his tramadol. A non-defendant nurse responded, stating that tramadol was counterindicated for him now that he was reporting gastrointestinal bleeding. The nurse set up an appointment for Key with a nurse practitioner, who explained her reluctance to prescribe tramadol or NSAID painkillers given Key's rectal bleeding. She prescribed him duloxetine and capsaicin cream. On December 27, 2016, Key was sent offsite for an MRI. The results showed that Key's right knee was normal, with some cartilage loss.

In January 2017, Key had several incidents of rectal bleeding, including an incident in which he was sent to the emergency room. WSPF providers and emergency room staff told Key to take acetaminophen for his pain.

Key underwent a colonoscopy at Gundersen Hospital on February 15, 2017; it showed that he had an anal fissure and rectal polyp. The polyp was removed and evaluated by pathology, which showed that Key had focal active colitis, an inflammatory bowel disease, in his cecum and ascending colon.

Defendant Nurse Practitioner McArdle reviewed the findings. McArdle does not present her own declaration recounting the events of this case. Instead, she refers to the medical record,

which shows that she responded to the findings by referring Key for treatment at the Gundersen gastrointestinal clinic.

On February 17, 2017, Key saw McArdle for a follow-up appointment for his knee pain. She recommended that he continue with his current treatment plan and medications. She also prescribed a painkilling gel, diclofenac, although it took weeks for Key to receive it.

In early March, McArdle prescribed Key sulfasalazine, a medication used to treat colitis by reducing irritation in the large intestine. Soon after, Key reported that he felt a pop in his knee and that he was now in constant severe pain. He said that duloxetine was not working for his pain, and that tramadol was the only medication had had worked for him. A nurse told him that the painkilling gel had just arrived for his use and that he had an offsite appointment scheduled for his knee.

The offsite specialist stated that there was no need for surgery. He would not recommend opioid pain relievers, but that "[a]n occasional tylenol or ibuprofen or tramadol is reasonable." Dkt. 53-1, at 18. Key met with defendant Nurse Edge to discuss this report. Key was relieved that surgery was not necessary, but he asked about what treatment he would receive for his pain. Edge told him that she would forward his concerns to his advanced care provider.

On March 24, 2017, Key met with McArdle and defendant Health Services Manager Waterman. Key said that his current medications were not working. McArdle said that the orthopedist recommended the continuation of current treatments. She said that tramadol was still counterindicated because of Key's colitis. She also said that prison guidelines recommended against ongoing use of controlled substances for chronic musculoskeletal pain.

She wrote him a prescription for Tylenol #3—acetaminophen with codeine, an opiate—but warned that he would receive that medication for only a limited time.

Key says that he told McArdle and Waterman that they were not following the "Opioid prescribing guidelines" posted on a wall. Key doesn't say what those guidelines said, but I infer that they allowed for more liberal prescription of opioid medications. Key says that defendants told him that those guidelines were old and no longer followed. Defendants say that they gave Key copies of the policies that guide DOC opioid-prescription decisions: the then-current DOC opioid prescribing guidelines, Dkt. 45-2, and the Wisconsin Medical Examining Board opioid prescribing guidelines, Dkt. 45-3.[1] The DOC guidelines' first rule is, "Use the *lowest dose* for the least amount of time possible." Dkt. 45-2, at 1 (emphasis in original).

Defendants say that under these policies and the "community standards" for treatment, it is not appropriate to treat benign, chronic pain conditions with opioids because they are not intended or recommended for long-term use for non-malignant pain management. Key disputes this, saying that defendants have no evidence supporting it. The guidelines presented by defendants do not categorically say that chronic pain cannot be treated with opioids, but the only reasonable inference from those materials is that their use is discouraged for chronic pain, particularly given the poor track record of those medications. *See, e.g.*, Dkt. 45-2, at 1 ("Be clear that the use of opioids is not intended to be long term but to help achieve a goal"); Dkt. 45-3, at 38 ("Chronic pain: Evidence for opioids is poor. . . . There are few if any treatments in medicine with this poor a risk/benefit ratio.").

---

[1] The state defendants do not provide the Medical Examining Board guidelines directly as a standalone document. The document they provide is in the form of a PowerPoint presentation discussing the guidelines. The guidelines appear to be presented verbatim within the presentation.

On April 17, 2017, Key was seen by an offsite gastrointestinal specialist. The specialist recommended that Key avoid all NSAID medication, including ibuprofen, naproxen, and diclofenac, as they could be causing the colitis. The specialist also said that Key should use opioid pain medications as little as possible because they would worsen symptoms of constipation associated with his colitis, and they are ineffective for abdominal pain.

Key saw McArdle on April 18. She prescribed a knee brace, scheduled Key to use an exercise bike three times a week, and issued a restriction on high-impact recreational activities such as basketball. Key says that he received a knee sleeve instead of a brace and that it was too small, but he does not say that this was McArdle's fault.

In early May, McArdle completed an "Authorization for Chronic Opioid Use" form, noting that various pain treatments had not been effective, that the latest MRI showed that Key's knee was normal, and that a specialist had recommended using controlled medications sparingly. She recommended continuing to taper Tylenol #3 because of the gastrointestinal specialist's report.[2]

Defendants say that the committee uses the DOC and Wisconsin Medical Board opioid prescription guidelines in making their decisions. The committee approved continuing the tapering of Tylenol #3, and for Key to finish with opioids for his "chronic, non-malignant pain" within 30 days. Dkt. 1-1, at 23. The "Committee Chair Signature" line on the form bore the electronic signature of defendant Hoftiezer.

---

[2] It's unclear why McArdle needed to submit this form, given that she had already prescribed Key Tylenol #3. I infer that she sought approval of her plan to taper that medication and not prescribe a new opioid.

Key saw McArdle in late May. Key again asked to try gabapentin for pain. McArdle says that she told Key that she would present his request for gabapentin to the Class III Committee; Key disputes that she told him that. It's undisputed that McArdle completed another "Authorization for Chronic Opioid Use" form, stating that Key requested to use gabapentin to treat his knee pain. McArdle referred Key for an electromyogram (EMG) of his knee and for a pain clinic evaluation. She also recommended use of a knee sleeve or Ace bandage. Key says that a knee sleeve was not discussed.

Defendant Waterman was present at the end of this meeting. The medical note shows that Key complained of not receiving adequate pain treatment and feeling as if no one wanted to help him with his pain. Dkt. 53-1, at 36. Key thought that McArdle was not following the opioid guidelines; it's unclear whether Key was referring to the outdated guidelines he previously raised or the ones in effect at the time. The parties dispute whether Key wanted only opioid medication or other non-opioid alternatives as well. Waterman says that she explained the DOC's opioid-prescription guidelines to him. Key says that she told him that inmates would receive opioids only if they were terminally ill or had just had surgery.

On May 30, the Class III Committee denied the request for gabapentin because that medication is used to treat neuropathic pain and there was no evidence that Key suffered that type of pain. This denial was signed by Dr. Gina Buono, not one of the defendants on the committee.

In June 2017, the Gundersen neuroscience pain management clinic refused McArdle's referral for further pain treatment for Key, stating that it "do[es] not have any additional pain management options to offer [Key]." *Id.* at 37. Later that month, Waterman received a call from the Gundersen pain clinic in response to a letter it had received from Key. Gundersen

staff referred Key to its orthopedics clinic because its neurosciences team had nothing left to offer Key.

On June 19, Key was seen again by the gastrointestinal specialist. The specialist recommended Tylenol as needed, Linzess (a drug that calms pain-sensing nerves in the bowel and accelerates bowel movements), scheduling an endoscopy, and stopping the anti-inflammatory medication that had been prescribed for Key's colitis. McCardle canceled the anti-inflammatory and prescribed acetaminophen 500 mg. She also submitted a "Non-Formulary Drug Request" form for Linzess to the DOC central pharmacy. Dkt. 59-7. The pharmacist noted the $334.78 cost of the drug and sent it on to the Bureau of Health Services' medical director. The parties don't explain the process for approval for this type of request, but Key says that Linzess was ultimately denied by the Class III Committee 33 days later and that McArdle did not meet with him to explain the denial or offer an alternative.

On August 1, 2017, Key had an EMG, which showed normal results. On August 11, Key was seen at Gundersen orthopedics. The surgeon stated that Key could either live with chronic pain or have a diagnostic arthroscopy that the surgeon estimated had a 20 percent chance of identifying a fixable problem. Key decided to have the procedure.

On October 2, Key had the endoscopy at Gundersen; it showed a normal small intestine.

Key underwent the arthroscopy on October 13. The surgeon debrided Key's patellar fat pad and dangling cartilage. The surgeon recommended a compression wrap for the knee for one to two weeks, keeping the leg straight and elevated, ice, and range-of-motion and quad-strengthening exercises.

Upon his return to the prison at around 12:45 p.m., Key saw Nurse Edge. Edge reviewed the surgeon's treatment recommendations; those recommendations did not include any

particular pain treatment. Key had already been prescribed acetaminophen 500 mg before the surgery. The parties dispute whether Key directly told Edge that he was in pain at this appointment, although Key did say, "Y'all better send me some pain pills," and he requested copies of the paperwork from the surgeon. Dkt. 45-1, at 17. Edge did not have the authority to prescribe stronger medication; she told Key that he would be notified if his advanced care provider or the offsite provider prescribed him additional medication. Edge forwarded the surgeon's recommendations to Key's advanced care provider for follow-up. Overnight, the on-call doctor ordered stronger medication, Tylenol #3, for Key after he complained to correctional staff about his pain.

Although Key alleges that Edge failed to treat his surgical wound that was bleeding though the dressing, Edge says that she examined Key and does not recall seeing any bleeding. The medical note from that meeting does not say anything about the wound site. On October 16, 2017, a non-defendant doctor examined Key; the doctor noted no drainage and minimal swelling. The doctor renewed Key's prescription for Tylenol #3.

A couple of days later, Key went to Gundersen for a gastrointestinal follow-up appointment. The specialist stated that a battery of tests had not revealed the cause of Key's colitis. Key requested surgery but was told that without a known cause for the problem, surgery would not be approved.

Key saw McArdle on October 24, 2017 for follow-up on his arthroscopic surgery; she noted no issues other than soft tissue swelling. McArdle ordered a Toradol injection and ibuprofen for pain and she recommended use of an Ace bandage for knee support. Defendant Edge gave Key the injection. Key says that he was "never" given Toradol "unless another name was used," *see* Dkt. 58, at 9, but he does not dispute that he was given a painkilling injection.

In December 2017, McArdle referred Key for physical therapy and again recommended use of a knee support. In April 2018, Key requested stronger pain medication, but McArdle responded that his request for controlled medication had already been denied by the Class III Committee and that those medications were counterindicated for Key because of his constipation.

The parties provide additional proposed findings regarding Key's continued treatment, but those events postdate the date of Key's complaint and are not part of this lawsuit, so I do not include most of those findings here. Key says that during the pendency of this lawsuit, another medical provider prescribed him amitriptyline—an antidepressant also sometimes used to treat pain—and that this treated his pain better than anything McArdle tried.

## B. Cellulitis

On August 2, 2017, Key woke up with the right side of his chest swollen and painful. He was dizzy, had difficulty breathing, and was nauseated. Key says that from 6:00 to 9:00 a.m., he repeatedly asked defendant Snodgrass for help, and that Snodgrass says "he did," Dkt. 59, ¶ 22, by which I take to mean that Snodgrass said that he contacted the Health Services Unit. Snodgrass says that he does not recall being notified about Key's problem, and the log book that would ordinarily contain that type of incident does not have an entry for that date. I must resolve this dispute in Key's favor and assume that Key told Snodgrass. But either way, no help came.

A little before 11:00 a.m., Key talked to the unit manager about his symptoms. Key was seen by defendant Nurse Edge ten minutes later.

Key says that Edge told him that the five-hour delay occurred because medical staff was performing lab work for other inmates who had already fasted, and because Program Review

Committee meetings were being held in the Health Services Unit space, so there was limited space. Edge doesn't explain exactly when she found out about Key's problem, but she says that he "was triaged based on the available time and urgency of other cases and was seen as soon as possible in the Health Services Unit." Dkt. 47, ¶ 27.

Edge contacted defendant Nurse Practitioner McArdle, who then treated Key. McArdle diagnosed Key with cellulitis, a type of bacterial skin infection. McArdle prescribed Key antibiotics, medication for nausea, and ice.[3] Key made no further complaints about his cellulitis. At Key's next evaluation, on August 19, 2017, Key's chest was no longer swollen and the cellulitis had resolved.

## ANALYSIS

Key brings Eighth Amendment claims against defendants for failing to properly treat his injured knee, colitis, and cellulitis. The Eighth Amendment prohibits prison officials from consciously disregarding prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111

---

[3] Defendants interpret the medical note, Dkt. 45-1, at 21, as saying that one of the prescribed medications is Koffex (a cough suppressant). But other documents make clear that Key received an antibiotic called Keflex. *See* Dkt. 45-1, at 62 (prescriber's note appearing to say that Key was prescribed Keflex, an antibiotic); Dkt. 59-6 (communication to Key stating that he received cephalexin, the generic name for Keflex).

F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

## A. Knee injury and colitis

### 1. Defendant McArdle

Key contends that he received inadequate pain treatment for his injured knee and his colitis. In particular, Key alleges that defendant Nurse Practitioner McArdle continued to prescribe him pain medications that had already been ineffective to treat his pain, she would not seek stronger opioid medications, and that a different provider eventually found a medication that worked for him. At the summary judgment phase, I will assume that Key's pain was a serious medical need.

A prison medical provider can violate the Eighth Amendment despite providing some care if the provider "persists in a course of treatment known to be ineffective" or a provider's decision is "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Petties v. Carter*, 836 F.3d 722, 729–30 (7th Cir. 2016). But in considering these

issues I must consider the totality of care that Key received, not just pick apart individual decisions. *Id.* at 728.

Review of all the care McArdle provided Key shows that no reasonable jury could conclude that she acted with conscious disregard to Key's pain. It's understandable why Key believes that he received inadequate treatment: he says that he continued to suffer severe knee and abdominal pain for almost the entire time of the events in this case. But the Eighth Amendment does not give prisoner the right to demand specific treatment nor does it guarantee successful treatment. It protects against a provider's conscious disregard. And the medical record shows that McArdle continually attempted to treat Key's pain. She prescribed several different types of medication, including Tylenol #3—an opioid—and she submitted Class III Committee requests for stronger medication. She also helped Key obtain other types of care such as a knee brace or sleeve, bike exercise, and recreation restrictions, and she made referrals to the pain, gastrointestinal, and orthopedic clinics, which eventually resulted in Key's knee surgery.

Key's major objection with this treatment is that McArdle did not prescribe stronger pain medications, instead continuing to try medications that Key says did not work. It's undisputed that McArdle did re-prescribe medications like acetaminophen several times despite Key saying that it didn't work. In his brief—although not in his proposed findings or declaration—Key says that his appointments, McArdle talked over his complaints and acted as if she were going through the motions in treating him. Dkt. 56, at 7–8. Regardless of Key's perception of his appointments, McArdle did attempt to get Key help in ways that could have resulted in him receiving new, stronger prescriptions: she sent his request for gabapentin to the

Class III committee, she forwarded the specialist's prescription for Linzess, and she referred him to outside providers, including the pain clinic.

Key fails to acknowledge that McArdle was constrained in her pain-treatment options in several ways: the state's opioid guidelines advised against the use of opioids for chronic pain like Key's, the Class III Committee approved tapering of Tylenol #3 and rejected the requests for gabapentin and Linzess, the pain clinic stated that there were no more options to treat him, other outside providers counseled against opioid use, and opioids were counterindicated for people with colitis. Even if opioids could in some circumstances be approved for someone with chronic pain, Key's other medical problems and the current medical standards for opioid prescriptions weighed against those medications being prescribed.

It's unfortunate that Key was prescribed effective medication—amitriptyline—only later, after McArdle's treatment was over. But McArdle's failure to find the right option for Key is at most medical malpractice. Given the record of her treatment and the constraints she faced in considering painkiller options, no reasonable jury could conclude that McArdle's course of treatment was so far outside the scope of accepted medical practice that it showed a lack of medical judgment. So I will grant defendant McArdle's motion for summary judgment on Key's Eighth Amendment claim about his chronic pain treatment.

Key also contends that McArdle violated his rights during other discrete incidents. Key says that he had no pain medication for a three-month period. From his materials I take him to be saying that this was actually a four-month period, from mid-May to mid-September 2017. Key's medical records do not show a complete lack of pain medication: he could take over-the-counter dosages of acetaminophen during this time, and he was prescribed capsaicin cream for at least part of this time. It is clear that Key found these medications to be ineffective, but

that's why McArdle took other actions during this time period to address his pain: she forwarded Key's request for gabapentin to the Class III Committee, and she made referrals to an outside provider for an EMG and to offsite clinics. This course of action does not show that McArdle consciously disregarded Key's pain; it shows that McArdle was trying to treat him.

Key alleges that McArdle lied to the Class III Committee about his progress to influence the denial of his request for gabapentin. McArdle argues that Key does not support this allegation with any evidence. Key doesn't address this issue in detail at summary judgment. But I infer from Key's version of the story and the opioid consent form McArdle filled out that Key believes that McArdle exaggerated the effectiveness of her current treatment. For instance, McArdle checked the box indicating that Key had a "good" degree of pain control because he "function[ed] without significant limitations." Dkt. 45-1, at 110. Key sent a letter to Waterman saying that his pain was not under control. *See* Dkt. 1-1, at 27. But McArdle did include the gist of Key's complaint: Key said that he was in constant pain and that none of the prescribed pain medications worked. From these facts, there's simply not a reasonable inference that McArdle was trying to sabotage the application. The exact wording of McArdle's statements didn't end up making a difference: the committee denied the request because gabapentin wasn't meant for musculoskeletal pain; it did not deny the request based on the *severity* of pain reported on the form.

Key also alleges that McArdle delayed getting him surgery. But Key received surgery about two months after he agreed to it; this is not an unreasonable wait time for surgery and there is no evidence that McArdle was responsible for the wait. So I'll grant summary judgment to McArdle on these claims as well.

### 2. Defendant Waterman

Key contends that defendant Waterman failed to help him after he complained about McArdle's lack of treatment and her misstatements on the Class III Committee form, ultimately telling him that he would not receive different pain medication. But I've already concluded that McArdle's treatment did not violate the Eighth Amendment, so Waterman's failure to intervene in the treatment did not violate the Eighth Amendment either. I'll grant the state defendants' motion for summary judgment on Key's claims against Waterman.

### 3. Defendant Edge

Key alleged that when he returned to the prison following surgery, he was in severe pain after his medication wore off, and his wound bled through the bandages; he further alleged that defendant Nurse Edge said that he should be given Tylenol but she otherwise did not arrange for him to be treated, even after Key he made repeated complaints.

Edge says that she examined Key and does not recall seeing any bleeding. The medical note from that meeting does not say anything about the wound site, and a record from a doctor noted no drainage a few days later. Key does not present any evidence disputing this, or otherwise supporting his original allegation about his wound bleeding through the dressing. Because it is Key's duty to present evidence that could prove his claim, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986), I will grant summary judgment to the state defendants on this part of Key's claim.

As for the part of Key's claim about pain treatment, it's undisputed that Edge met Key around 12:45 p.m. on the day of the surgery, that Key said that he wanted pain medication, and that Edge told Key that he would be notified if the offsite provider or his advanced care provider at the prison authorized something stronger. At that point, Key had already been

prescribed acetaminophen 500 mg, and the surgeon's recommendations did not include any new pain medication. I take Key to be saying that this is incorrect: he refers to the surgeon's post-surgical instructions, which state, "You may be given a prescription for narcotic pain reliever." Dkt. 45-1, at 92. But that is a stock information sheet not tailored to Key's care; the record of the surgical procedure shows that the surgeon did not actually prescribe him new pain medications. There is no evidence that Edge consciously disregarded Key's pain at the appointment.

Key contends that Edge disregarded his pain later in the day: Key says that his post-surgery medication started to wear off, and that he made at least two requests to Edge for stronger medication, but Edge said that he would get only Tylenol. It's undisputed that Edge could not prescribe medications herself; I presume what Key means is that Edge did not refer his complaints of increased pain to someone who could prescribe something else, and that he was forced to wait to overnight to be prescribed stronger medication. But Key does not support his proposed findings about these evening requests to Edge with any evidence, not even statements from his declaration. The only part of the record I see discussing these events is Key's later grievance, in which the examiner found no evidence of Key's alleged requests. *See* Dkt. 1-1, at 64. So even if Edge was the person responsible for forwarding a request by Key to a prescriber—a point that Key does not support with evidence either—Key has failed to set forth evidence showing that Edge ignored his complaints. So I will grant summary judgment to Edge on this part of Key's claim.

### 4. Defendants Greer and Hoftiezer

I granted Key leave to proceed on claims that defendants Greer and Hoftiezer sat on the Class III Committee and enforced policies limiting stronger medication. Defendants say

that Greer and Hoftiezer sat on some committee decisions but not on the particular decisions at issue here. Key provides evidence disputing only one of those decisions: Hoftiezer signed the May 4, 2017 approval of McArdle's recommendation to continue tapering Tylenol #3 and for Key to be off opioids for "chronic non-malignant pain in less than 30 days," so it's fair to assume that he was part of this decision. But Key fails to show that that decision was so far outside the scope of accepted medical practice that it could be considered conscious disregard of his needs. Rather, the committee followed policies suggesting that opioids were inappropriate for this kind of problem, and it placed Key's care in the hands of McArdle and offsite providers to try other means to reduce his pain, which they indeed tried to do. No reasonable jury could conclude that this violated the Eighth Amendment.

With regard to Key's claim that he was denied specialist-prescribed Linzess, there is no evidence that Greer and Hoftiezer had any personal involvement in that decision, so they cannot be liable for the denial.

As for the opioid claims, defendants' personal involvement in the particular committee decisions at issue is not Key's only theory. Key alleges that they are responsible for enforcing DOC policies limiting the use of opioid drugs that he contends harm him. Greer and Hoftiezer are high-level officials at the Bureau of Health Services, so there's a reasonable inference that they are responsible for creating or enforcing those policies.

But the problem for Key is that he cannot show that adoption of those policies violates the Eighth Amendment. It stands to reason that limiting opioid prescriptions might result in more patients suffering pain—although I note that the Medical Board's guidelines suggest that there is no evidence proving that opioids are actually effective in treating chronic pain like Key's. Dkt. 45-3, at 38 ("There is no high-quality evidence to support opioid therapy longer

18

than 6 months in duration."). Key does not present evidence showing that the DOC's decision to limit opioids is the result of conscious disregard; the only evidence here shows that the guidelines were the result of medical authorities re-thinking opioid prescriptions in light of evidence showing questionable effectiveness of those medications. And the policies were only one factor in the denial of opioids; Key also did not receive them because they were counterindicated for him because of his colitis. The denial of gabapentin was not based on the opioid guidelines; it was based off the medical opinion that gabapentin would not work for the type of problems Key had. So I will grant summary judgment to the state defendants on these claims.

### 5. Defendant Snodgrass

Key alleges that defendant Sergeant Snodgrass denied Key his mental-health and gastrointestinal-pain medications about 30 times. In his complaint, Key referred to two inmate grievances he filed about receiving his medications: one that was dismissed because the examiners concluded that Key had not appropriately asked over the intercom for a medication provided on an "as needed" basis, and one that was granted because the correctional officer should have given Key the medication despite Key's failure to request it via intercom before "medication pass" time. *See* Dkt. 1-1, at 74–81. Defendants contend that Snodgrass was not responsible for handing out medication to Key.

Key barely mentions this claim in his brief in opposition; all he does is point to the DOC's medication distribution policy to say that inmates should not be denied medications for their failure to use the intercom to request it before medication pass. He does not submit proposed findings of fact explaining how Snodgrass was personally involved in denying him medications. Only in his declaration does he state that at some point he asked Snodgrass to

intervene in correctional officers' denials of medications, and that the problem was not fixed until Key talked to the unit manager and filed a grievance that the problem was fixed. Dkt. 59, ¶ 34. Key also states that after he complained, Snodgrass himself woke Key up on several occasions to ask him whether he wanted his medications. *Id.* ¶ 35.

I will grant summary judgment to the state defendants on this claim because Key fails to meet his burden to produce evidence proving this claim. Even if I consider the statements in his declaration that he leaves out of his proposed findings of fact, he presents only a vague assertion that Snodgrass failed to intervene to help him regarding correctional officers' denials of his medication concerning a dispute over whether prison policy required Key to use the intercom to call for his medications. Prison staff's misapplication or even violation of its policies does not itself violate the Eighth Amendment. *See, e.g.*, *Earl v. Karl*, 721 F. App'x 535, 537 (7th Cir. 2018). Also, Key does not explain why it was Snodgrass's responsibility to do anything to resolve the problem. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. . . . [P]eople who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being ombudsmen."). Nor does Key explain what Snodgrass did or did not do in response to Key's request, or how much time passed between the request and Key's complaints to other staff members.

The lack of detail about Snodgrass's actions, coupled with the fact that Snodgrass later personally intervened several times to ask Key whether he wanted his medications, means that no reasonable jury could infer that Snodgrass consciously disregarded the problem. Given the dearth of facts in the record concerning this claim, a jury could only speculate about Snodgrass's culpability, which is not enough to avoid summary judgment. *See, e.g.*, *Herzog v.*

*Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) (While nonmovant "is entitled . . . to all reasonable inferences in her favor, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." (citation omitted)).

**B. Cellulitis**

Key's final set of claims concerns the five-hour delay in treatment for his cellulitis, which unquestionably was a serious medical need.[4] He brings claims against Snodgrass and Edge, although the record is unclear how much of the delay is attributable to each defendant. Key says that he told Snodgrass about his swollen chest and that Snodgrass told him he relayed the concern, but no help came. Then later, when Key told the manager, Key was seen within ten minutes. This suggests that Snodgrass lied about relaying Key's problem to health staff. On the other hand, despite Key being seen very quickly after Key told the unit manager, defendants provide vague statements that Edge triaged Key's problem appropriately, making it seem that Edge knew about the problem and decided that it could wait. And Key says that Edge told him that he had to wait because of lab work being performed for fasting prisoners and because of the lack of space in the Health Services Unit.

Key suggests that the medical staff could have split their work between the lab work and his problem, and that there was space available in the Health Services Unit or on his unit. But he doesn't provide evidence showing how he knows that these were legitimate alternatives. In any event, Edge did ultimately get the ball rolling on treatment. Even if I assume that Edge

---

[4] *See* Mayo Clinic, *Cellulitis*, www.mayoclinic.org/diseases-conditions/cellulitis/symptoms-causes/syc-20370762 ("Left untreated, the infection can spread to your lymph nodes and bloodstream and rapidly become life-threatening.").

erred in triaging the lab work over Key's infection, that's perhaps the basis for a medical malpractice claim, not an Eighth Amendment claim for conscious disregard.

Snodgrass's failure to notify health staff is troubling because correctional staff is expected to seek out help for ailing prisoners. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants cannot simply ignore an inmate's plight."). But defendants persuasively argue that Snodgrass (and Edge, for that matter) cannot be liable for an Eighth Amendment violation because the five-hour delay did not harm Key. *See Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) ("Delaying treatment may constitute deliberate indifference if such delay exacerbated the injury or unnecessarily prolonged an inmate's pain." (internal citations and quotations omitted)); *see also Gutierrez*, 111 F.3d at 1374 (no Eighth Amendment violation for six-day delay in treating mild cyst infection).

Once Key was treated, he made no further complaints, and a follow-up appointment showed that the swelling had subsided and the infection was gone. Had Key been subjected to severe pain during the delay, that could be enough to support a claim, but in his opposition brief, Key says that it was only "mildly painful to breathe." Dkt. 56, at 9. Therefore, I will grant summary judgment to the state defendants on Key's Eighth Amendment cellulitis claims.

ORDER

IT IS ORDERED that:

1.  Defendants' motions for summary judgment, Dkt. 42 and Dkt. 50, are GRANTED.

2. The clerk of court is directed to enter judgment for defendants and close this case.

Entered December 18, 2019.

BY THE COURT:

/s/
_____
JAMES D. PETERSON
District Judge